**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BELDEN CANADA ULC,

      Plaintiff,

    v.

COMMSCOPE, INC., COMMSCOPE, INC.
OF NORTH CAROLINA, and
COMMSCOPE TECHNOLOGIES LLC,

      Defendants.

Civil Action No. 22-782-RGA

<u>MEMORANDUM OPINION</u>

Pilar G. Kraman, Robert M. Vrana, Alexis N. Stombaugh, Jennifer P. Siew, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE; Douglas J. Nash, John D. Cook, BARCLAY DAMON LLP, Syracuse, NY; Naresh K. Kannan, BARCLAY DAMON LLP, Albany, NY; Michael A. Dorfman, BARCLAY DAMON LLP, Washington, D.C.,

    Attorneys for Plaintiff.

Sara M. Metzler, Kelly E. Farnan, RICHARDS LAYTON & FINGER, P.A., Wilmington, DE; Philip P. Caspers, Timothy A. Lindquist, Dennis C. Bremer, Tara C. Norgard, William F. Bullard, Mitchell R. Williams, CARLSON, CASPERS, VANDENBURGH & LINDQUIST, P.A., Minneapolis, MN,

    Attorneys for Defendants.

October _9_, 2025

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are Belden's motions for Partial Summary Judgment (D.I. 222) and exclusion under *Daubert* (D.I. 225) and CommScope's motions for Summary Judgment of Equitable Estoppel (D.I. 223), Failure to Mark (D.I. 224), Non-Infringement (D.I. 226), and exclusion under *Daubert* (D.I. 228). I have considered the parties' briefing. (D.I. 227, 229, 238, 243, 258, 260). I have considered the oral arguments I recently heard on September 22nd (D.I. 291) and September 30th (D.I. 313; No. 24-411, D.I. 72). For the reasons that follow, Belden's partial summary judgment motion (D.I. 222) is DENIED and its *Daubert* motion (D.I. 225) is GRANTED. CommScope's equitable estoppel and non-infringement summary judgment motions (D.I. 223, D.I. 226) are DENIED, its failure to mark summary judgment motion (D.I. 224) is GRANTED, and its *Daubert* motion (D.I. 228) is DENIED.

## I.    BACKGROUND

Belden accuses eleven CommScope product families of infringing U.S. Patent No. 6,409,547 ("Reede"). (D.I. 1; D.I. 308 at 32). Reede is directed to "improvements in jacks used with network cables." (D.I. 227 at 1).

For the purposes of the parties' present motions, the relevant claim is asserted independent Claim 6 of Reede.[1] That Claim reads:

> A connector providing counter coupling including a plug and a jack having a plug receiving cavity, said jack comprising:
>
>> a plurality of contacts juxtaposed side-by-side and arranged in a single row,
>>
>> Said contacts including a [*sic*] cantilever spring contacts mounted to extend into said plug receiving cavity, said cantilever spring contacts having a mounted end and a moveable end; and

---

[1] The only other asserted claim is Claim 10, which depends from Claim 6. (D.I. 291 at 3).

at least two of said spring contacts having capacitive coupling elements electrically connected to said moveable ends of said at least two spring contacts and located outside of a conductive path between said jack and said plug, said capacitive coupling elements providing capacitive coupling.

(D.I. 1-1 at 29 of 31) ("Reede, Claim 6").

A jury trial is set for October 20, 2025. (D.I. 31).

## II.    LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.*  The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989).  A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the

3

absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended Dec. 1, 2023). The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The

Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[2]

## III.    DISCUSSION

### A. Both Parties' Equitable Estoppel Motions Are Denied.

Both parties move for summary judgment on the issue of equitable estoppel. (D.I. 222, 223).    CommScope argues that Belden is estopped from suing because Belden created the misleading impression that it would not sue CommScope, which CommScope relied on. (D.I. 229 at 1).    Belden argues that because of the general rule that "[s]ilence alone will not create an estoppel" (D.I. 227 at 2), any support in the record for CommScope's equitable estoppel argument is legally insufficient (*id.* at 1).    I find that there exists a genuine dispute of material fact, and therefore deny both parties' motions.

Equitable estoppel consists of three elements:

(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

---

[2] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion.

*Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992)). "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *Aukerman,* 960 F.2d at 1028. Moreover, "on summary judgment, such inference must be the *only* possible inference from the evidence." *Id.* A "plaintiff's inaction must be combined with *other facts* respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned." *Id.* at 1042 (emphasis added).

The relevant background is as follows.

In 2004, CommScope's general counsel sent a letter to Cable Design Technologies ("CDT") asserting that it infringed two CommScope patents. (D.I. 229 at 1). CDT responded that it was merging with Belden, and that if CommScope did discuss its patents with Belden following the merger, it "should be prepared to discuss a number of CDT patents that appear quite relevant to CommScope . . . ." (D.I. 231 at 92 of 124; A088).[3]

In February of 2005, representatives of Belden and CommScope met to discuss each company's patents. (D.I. 227 at 5–6). "CommScope walked through a [] slide deck that detailed its contentions that [Belden's] products infringed [CommScope's patents]. Belden then walked through a [] slide deck that both rebutted CommScope's claims of infringement and set forth an

---

[3] Both parties provide appendices. Belden's appendix includes the following docket entries: D.I. 231, 232, 239, 240, 258. CommScope's appendix includes the following docket entries: 233, 234, 235. For ease of reading, I cite to the parties' appendices as the parties do: citations to Belden's appendix are styled "AXXXX" and citations to CommScope's appendix are styled "DAXXXX."

infringement analysis of certain CommScope products based on two [Belden] patents, [including] Reede." (*Id.*). This discussion continued during a second meeting in July 2005. (*Id.* at 6).

Following the second meeting, CommScope sent Belden a draft license agreement, "and Belden asked for past sales information concerning the CommScope products alleged to infringe Reede" (*id.*), which CommScope then refused to provide (*id.*). The discussions "trailed off" until June of 2006, when CommScope sent an email to Belden stating that its litigation in another matter was "occupying the attention of [its] patent lawyers" and that it "remain[ed] committed to enforcing [its] patents, and wish[ed] to continue [its] discussions with [Belden] for a license agreement." (D.I. 227 at 7) (citing A241). Belden responded that it made sense to wait until the conclusion of CommScope's other litigation. (*Id.*) (citing A236). CommScope followed up with Belden to provide an update on its litigation efforts and to request "an indication of when we may be able to meet." (*Id.*) (citing A236). Belden never responded, and the parties did not discuss Reede again until Belden filed this case in 2022. (*Id.*).

Because the parties paint different pictures with respect to how negotiations from 2004 to 2006 progressed, reasonable inferences could be drawn in either party's favor. That makes equitable estoppel an issue that I cannot resolve on summary judgment.

In CommScope's view, Belden made "re-assuring statements" such as "Belden was 'not looking for trouble'" (D.I. 229 at 8) (citing DA0107–109), and that the subtext of the negotiations was "let's not sue each other" and "let's not do this" (*id.* at 8) (citing DA0096). According to CommScope, Belden offers no explanation for its sixteen-year delay in bringing suit, apart from Belden's witness's explanation that Belden was not planning on affirmatively asserting Reede. (D.I. 229 at 9). And two of CommScope's witnesses testified that they relied on the inference "that Belden had dropped the matter." (*Id.* at 10).

In Belden's view, CommScope could not have formed a reliance on Belden's representations during the negotiations because "[i]t is undisputed . . . that CommScope was the aggressor during the parties' discussions from 2004 to 2006 . . . ." (D.I. 227 at 13). Therefore, the details of the negotiations themselves could not provide "other facts" beyond silence allowing for an inference that CommScope was free from suit. *Aukerman,* 960 F.2d at 1042. Belden does not address whether its "not looking for trouble" comment could have led CommScope to the reasonable inference that Belden would not sue.

Considering the dispute over what the parties might have reasonably inferred from their negotiations, I find that this issue is best resolved after holding a bench trial. Both parties' equitable estoppel summary judgment motions are denied.

### B. Belden's *Daubert* Motion Is Granted.

Belden moves to exclude a portion of the testimony of Mr. Schoettelkotte, CommScope's damages expert. (D.I. 225). As Belden characterizes it, Mr. Schoettelkotte relied "on an intra-company internal reorganization agreement between two commonly-owned and controlled entities of the same parent entity, Belden Inc.," that was "entered into after Reede expired and more than fifteen years after the date of Mr. Schoettelkotte's primary hypothetical negotiation."[4] (D.I. 227 at 23). Belden argues that relying on this agreement is "unreliable and should be excluded because the agreement is not comparable to a license arising from a hypothetical negotiation . . . ." (*Id.*). I agree.

---

[4] "Primary" because Belden says the hypothetical negotiation occurred in 2004 and CommScope says it occurred in 2011. Mr. Schoettelkotte offered opinions for both dates, with only slight differences. (D.I. 291 at 15-16).

8

"[Expert t]estimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Schneider*, 320 F.3d at 404 (cleaned up).

Here, Mr. Schoettelkotte concluded that "a reasonable royalty for license rights to the asserted claims of [Reede] is between $31,849 and $330,000." (A873). The reliability of the method by which Mr. Schoettelkotte reached that result is not in dispute, except for the fact that he considered a 2020 purchase agreement between Belden Canada Inc. and Belden Canada ULC, both of which are owned and controlled by Belden Inc. (D.I. 227 at 24–25) (citing A330–33). That agreement, among other things, effectuated the sale of Reede from Belden Canada Inc. to Belden Canada ULC at a purchase price "equal to the fair market value thereof . . . as set out in Schedule B." (*Id.* at 25) (citing A322). Schedule B listed "intangibles, computer software, [and] patents" as having a fair market value of $93,473. (*Id.*) (citing A331). Mr. Schoettelkotte went on to adjust the $93,473 figure in reaching his reasonable royalty determination.

When an agreement that forms the basis of a reasonable royalty analysis post-dates the hypothetical negotiation, there is "legitimate reason to exclude it." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1332 (Fed. Cir. 2012). *ActiveVideo* held that it was not an abuse of discretion for the district court to exclude testimony concerning an agreement that "post-dated the hypothetical negotiation by four years." *Id.* The agreement here was not a licensing agreement. It post-dates the hypothetical negotiation by more than fifteen years. Perhaps more importantly, the agreement was entered into after Reede expired. And while it is true that Mr. Schoettelkotte attempts to control for the date of the agreement by adjusting for both inflation and the changing market (as the number of applications for the technology disclosed in Reede grew between 2004 and 2016) (A816), CommScope does not argue that Mr. Schoettelkotte ever

9

explained why an agreement to transfer an expired patent is at all probative of the patent's value about fourteen years before it expired.[5]  (D.I. 243 at 32–41).  Were any of the foregoing not an issue, the intra-company nature of the transaction would still render the use of this agreement highly suspect.  There is no evidence that it was the product of an arm's length negotiation.  I am not persuaded that an intra-company agreement executed pursuant to an internal reorganization, absent any kind of competitive posture between the agreement's signatories, accurately reflects the value of the agreement's subject, whatever the agreement's terms.  Belden's motion to exclude Mr. Schoettelkotte's testimony with respect to this agreement is therefore granted.

### C. CommScope's *Daubert* Motion Is Denied.

CommScope argues that Belden's damages expert, Kimberly Schenk, "improperly anchored her reasonable royalty analysis on a 2011 hypothetical negotiation, rather than the date of first alleged infringement—2004."  (D.I. 229 at 54).  Belden responds that 2011 is the correct hypothetical negotiation date, and that even if I determined otherwise, Ms. Schenk's opinions would remain the same.  (D.I. 238 at 35).

CommScope's argument centers on Belden's "binding admission" that the MGS400 as sold in 2004 infringed Reede's Claim 6 "based on the same interpretation of [that Claim] that [Belden] applies in this lawsuit."  (D.I. 229 at 55) (citing DA0322-23).  Therefore, because "the date of the hypothetical negotiation is the date that the infringement began," *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012), the hypothetical negotiation date must be 2004.

---

[5] The only value of an expired patent is the value it would have as a weapon in seeking past damages for infringement.  The valuation of an asset only useful for potential litigation involves, at the very least, much different considerations than the valuation of a non-expired patent, the value of which would depend mostly on considerations of its invention's usefulness in a product.

Belden responds that the 2004 version of the MGS400 is materially different from the later version. (D.I. 238 at 37).[6]  Therefore, it is a different product for purposes of infringement and that "the hypothetical negotiation date [sh]ould be at the start of the present infringement and not at the start of the prior infringement." (*Id.* at 37–38) (quoting *Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*, 255 F. Supp. 3d 1134, 1139 (D. Kan. 2017)).

Belden is correct that different products require different infringement dates. *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1363 (Fed. Cir. 2006) ("The two infringements caused by [two products'] sales began at *different* times, and require two different hypothetical negotiation dates."). Whether the two versions of the MGS400 are materially the same or different, however, is a question of fact for which there is a material dispute. (D.I. 238 at 37; D.I. 260 at 18–19).[7]  I therefore decline to grant CommScope's *Daubert* motion.

### D. CommScope's Failure to Mark Motion Is Granted.

CommScope argues that Belden is not entitled to damages because it failed to mark some of its products—the "10GX jack, jack couplers and the REVconnect jack" (D.I. 291 at 4)—and did not provide notice to CommScope of its alleged infringement until it filed suit. (D.I. 229 at 17). Belden concedes it did not mark those products. (D.I. 291 at 4). Belden responds that its products do not practice Reede, and that it was therefore under no obligation to mark its products; in the alternative, Belden argues that whether it provided CommScope with actual notice in 2004–2006 is an issue for which there remains a dispute, making the failure to mark motion inappropriate for summary judgment. (D.I. 238 at 10).

35 U.S.C. § 287(a) provides,

---

[6] Belden cites CommScope's technical expert for this point.

[7] It also seems like an insignificant dispute, since both damages experts are expected to give essentially the same opinion regardless of the date of the hypothetical negotiation.

Patentees . . . may give notice to the public that the [patented article] is patented. . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

It is the plaintiff's burden to plead and prove actual notice. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017). The alleged infringer "bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Id.* at 1368. Once the alleged infringer meets its burden of production, "the patentee bears the burden to prove the products identified do not practice the patented invention." *Id.*

Even though it is the plaintiff's burden to plead and prove actual notice, Belden does not argue that it has ever pleaded any actual notice prior to filing its complaint in 2022.[8] (D.I. 238 at 10–11; D.I. 260 at 7).[9] Nor did any of Belden's actions provide notice—by all accounts, Belden is making its 2004–2006 notice argument for the first time in summary judgment briefing. (D.I. 238 at 11).[10] Belden's position has been that the accused products are different from the product that was the subject of discussions in 2004–2006 (D.I. 291 at 9-15), which is why any discussions

---

[8] CommScope cites Belden's answer to an interrogatory in which Belden stated "actual notice" was given by the filing of the lawsuit. (D.I. 260 at 7) (citing DA0481). The relevant portion of the interrogatory is, Q: "If You contend You satisfied the actual notice provision in 35 U.S.C. §287, explain as specifically as possible how You satisfied the actual notice provision . . . ." The relevant portion of the response is, "Belden states that Belden never made, offered for sale, or sold any patented articles, and never failed to mark any patented article." On June 14, 2024, Belden supplemented that response by stating, in full, "Belden gave actual notice by filing the Complaint (D.I. 1) on June 13, 2022." (DA0481).

[9] The complaint alleges that CommScope was "made aware of the '547 Patent in 2005." (D.I. 1 at 9). There is no allegation in the complaint that CommScope was given any notice of infringement at any time. Nor is there any allegation in the complaint that Belden ever marked any of its products.

[10] The proposed pretrial order states that neither party intends to amend any of its pleadings. (D.I. 308 at 37).

12

in that time period would not be "the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indu. Inc. v. Buckeye Stel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). The difference in the products is why Belden's damages expert placed the hypothetical negotiation in 2011. I therefore reject the argument that Belden gave actual notice before the complaint was filed.

That leaves Belden's other argument—that its products do not practice Reede. Resolving that dispute requires construing terms in Claim 6 of Reede. Claim 6 includes the element "at least two of said spring contacts having *capacitive coupling elements* electrically connected to said moveable ends of said at least two spring contacts and located outside of *a conductive path* between said jack and said plug, said *capacitive coupling elements* providing capacitive coupling." Reede, Claim 6 (emphases added). Belden's position is that its products, for two reasons, did not have capacitive coupling elements located outside of a conductive path. If there are multiple conductive paths, Belden's products have capacitive coupling elements located outside at least some of the conductive paths. If there is only one conductive path, Belden's capacitive coupling elements are still outside the conductive path unless the capacitive coupling elements have to together form a capacitor. The parties' claim construction dispute thus covers two issues, both with the potential to resolve any factual disputes on the issue of whether Belden's products practiced Reede. First, what does "a conductive path" mean? (D.I. 229 at 29–33; D.I. 238 at 11–15; D.I. 260 at 8–9, 10–12). Second, must the "capacitive coupling elements" be part of the same capacitor? (D.I. 229 at 26–29; D.I. 238 at 15–19; D.I. 260 at 9–12). After resolving these claim construction issues, I find that the Belden products practiced the Reede patent and thus Belden failed to mark its products. Since Belden did not mark its products, it cannot get any

13

damages until it gave actual notice. Since it did not give actual notice until 2022, and the patent expired in 2019, Belden cannot prove any damages.

### 1. "a conductive path"

CommScope asks that I adopt the construction "one or more" in place of "a" in Claim 6's "a conductive path" language. (D.I. 229 at 21). Belden asks that I adopt the construction "the main conductive signal-carrying path between the plug and jack terminal" (D.I. 291 at 40:20–41:10) or "the path between the plug, the contacts of the jack, and a cable connected to the jack." (*Id.* at 47:16–48:2) (citing D.I. 81 at 16, 20–23 via a demonstrative).

The significance of this dispute is as follows. When a plug is inserted into a Belden jack, "signals travel from the plug through the [printed circuit board ("PCB")]. (D.I. 229 at 22). The PCB contains "metal traces to form conductive paths and capacitive coupling elements." (*Id.*). According to CommScope, there are *eight* such conductive paths (depicted below in blue arrows), one for each metal trace. (*Id.*). Therefore, the "capacitive coupling elements," two of which are highlighted below in light blue, are outside of at least one of the eight conductive paths:



(D.I. 229 at 25) (citing DA2551. Belden's expert agrees with CommScope that the eight sub-paths are each their own conductive path: "I further reiterate my earlier opinion . . . that each of the Belden Products does have plural conductive paths"; "I also agree with [CommScope's expert] that there is one conductive path for each of the eight lines for a total of eight conductive paths." (DA2574). Because the capacitive coupling elements are outside at least one conductive path, CommScope argues, Belden's products practice Reede, Belden failed to mark, and Belden is entitled to no damages. (D.I. 229 at 17–33). And because Belden's expert agrees that there are plural conductive paths, CommScope argues that there is no genuine dispute of material fact and that this issue should be resolved at the summary judgment stage. (D.I. 229 at 20) ("[T]he only issue is Belden Canada's excuse that its products do not practice the patent, but that excuse is resolved by the claim constructions.").

I decline to adopt CommScope's construction, and instead adopt Belden's construction, "the path between the plug, the contacts of the jack, and a cable connected to the jack."

It is a "rule, rather than merely [] a presumption or even a convention," that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). "The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Id.* (cleaned up). "An exception to [this] general rule . . . only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule." *Id.*

I conclude that this is the rare instance in which the patentee has satisfied an exception to the rule. The patentee evinced a clear intent to limit "a conductive path" as it appears in Claim 6 to the singular "*the* conductive path." Reede's specification references the main conductive path at several points, stating, "Advantageously, the[] plates [forming the compensation structure] are located outside of the main signal parts"; "The compensation structure is . . . located outside the conductive path carrying the high-frequency data signal"; and "[P]arallel capacitive plates . . . are placed . . . outside the path taken by the current that conveys the high frequency signal from the contact point of plug [] to jack. . . ." Reede, col. 4, lines 12–21, 57–60, col. 9, lines 39–52. These inclusions are no mistake—indeed, Reede touted the benefit of such an arrangement, explaining, "This location [of the compensation structure] isolates the inductance due to the cantilever contacts from the compensating capacitance." Reede, col. 4, lines 14–16. Belden characterizes this arrangement as the "key point of novelty of Reede" (D.I. 238 at 12), which CommScope does not dispute (D.I. 260 at 8–12).

16

To be sure, Reede refers to plural "conductive paths" as well. In claim 3, for example, Reede refers to "a plug . . . including a plurality of contacts arranged to provide conductive paths" and "a compensation structure located near contact points forming said conductive paths . . . ." But it also states, later in the same Claim, that the compensation structure is "located outside said conductive path . . . ." Reede's abstract follows the same pattern. Reed, Abstract. Rather than suggesting, as CommScope argues (D.I. 291 at 52:24–25), that every sub-path must be considered its own conductive path for the purposes of claim construction, Reede's language suggests that the patentee was aware of different kinds of "conductive paths"—the sub-paths and the whole. But because placing the capacitive coupling elements outside some sub-paths but inside others would do little to serve the purpose of the invention (D.I. 238 at 12), Reede is clearly understood as claiming capacitive coupling elements outside the whole conductive path, rather than outside of any one sub-path.

Belden's point finds further support in the fact that CommScope's construction would sweep up "every RJ-45 jack ever created that includes capacitive coupling elements anywhere in the jack . . . ." (D.I. 238 at 12). CommScope never argues otherwise. (D.I. 260 at 8–12). I agree with Belden that such a construction is unlikely to reflect the "key point of novelty of Reede," which "was providing the capacitive coupling outside the conductive path . . . ." (D.I. 238 at 12). I therefore adopt Belden's construction.

### 2. "capacitive coupling elements"

The parties' second dispute is whether "capacitive coupling elements" must be part of the same capacitor. (D.I. 229 at 22–29; D.I. 238 at 15–19). The significance of this dispute is as follows. A capacitor forms when two traces in the PCB overlap. (D.I. 229 at 29) (citing DA2574,

DA0496, and DA0216). CommScope provides a figure indicating where two such capacitors exist in Belden's products:



(D.I. 229 at 30) (citing DA2554). Because Belden concedes that the bottom elements of these two capacitors are not on the main conductive path (D.I. 238 at 18), CommScope argues that, per the language of Claim 6, the two bottom elements in its figures are "capacitive coupling elements . . . located outside of a conductive path between said jack and said plug, said capacitive coupling elements providing capacitive coupling." Reede, Claim 6. Belden responds that because the two bottom elements are not themselves part of the same capacitor (i.e., they do not overlap with each other), they cannot be said to "provid[e] capacitive coupling" as required by Claim 6. (D.I. 238 at 18–19) (quoting A1137 at 222:12–23). Accordingly, CommScope requests the construction "capacitive coupling elements . . . located outside [one or more] conductive path between said jack

18

and said plug." (D.I. 229 at 21). Belden requests the construction "the capacitive coupling elements are not located on the same path between the plug, the contacts of the jack, and a cable connected to the jack," such that there is only one main conductive path and the "capacitive coupling elements" must be part of the same capacitor. (D.I. 81 at 17; D.I. 238 at 15–16).

I adopt CommScope's construction. Belden's argument rests on the assertion that for capacitive coupling elements to "provide capacitive coupling," they must form a capacitor. (D.I. 238 at 15–16). Neither party disputes that interpretation. (*Id.*; D.I. 260 at 8–9). But nothing in the language of the Claim suggests that the capacitive coupling elements must form a capacitor *with each other*. (D.I. 260 at 9). It is sufficient, under the Claim language, that each capacitive coupling element individually provide capacitive coupling, presumably with other capacitive elements that may or may not be located within the conductive path.

I therefore adopt CommScope's construction—nothing in Claim 6 requires that the capacitive coupling elements be part of the same capacitor. As Belden has conceded that the two capacitive coupling elements are outside either the "main" or any included sub-paths (D.I. 238 at 18), there is no dispute of fact. Belden's products practiced Reede. Thus, Belden failed to mark its products. CommScope's failure to mark motion is granted.

### E.  CommScope's Non-Infringement Motion Is Denied.

CommScope raises four non-infringement arguments.

Though I accept CommScope's arguments with respect to claim construction, I deny CommScope's motions for summary judgment because there still exist genuine disputes of material fact. Specifically, CommScope devotes scant briefing (a cursory paragraph at the end of each section) to the issue of doctrine of equivalents. And with respect to each claim construction dispute, Belden contests doctrine of equivalents and argues that its expert will testify as to non-

19

infringement even under CommScope's construction. (D.I. 238 at 32–35). These are triable issues for which summary judgment is inappropriate. Below are my findings with respect to claim construction.

### 1. "plurality of contacts juxtaposed side-by-side and arranged in a single row"

The parties dispute whether "contacts" means the length of the conductive contact springs from end to end or just the regions of the springs where the jack mates with the plug. (D.I. 229 at 40; D.I. 238 at 20). CommScope proposes the construction: "Two or more closely positioned contacts that are arranged side-by-side and in a single row along the entire length of the contacts[.]" (D.I. 81 at 52). Belden proposes the construction: "the contacts of the jack are arranged in parallel where the contacts of the jack mate with a plug[.]" (*Id.*).[11]

The significance of this dispute is that if "contacts" is construed to include the length of the conductive contact springs from end to end, then, according to CommScope, the contacts in CommScope's products cannot be said to be "side-by-side and arranged in a single row," as they cross over each other and "vary in elevations at the cross-over region . . . ." (D.I. 229 at 44).

CommScope raises several persuasive arguments in support of its construction. First, Claim 6 says that the "contacts includ[e] [] cantilever spring contacts" that themselves "hav[e] a mounted end and a moveable end . . . ." Reede, Claim 6. Second, other claims in Reede distinguish between "contacts" and "contact points." (D.I. 229 at 40) (citing Reede, Claims 1, 3, 4). Third, Representative Figures 2I and 4 use "lead lines"[12] to refer to different portions of the conductive

---

[11] At the September 30th argument, the parties agreed upon common language ("two or more closely positioned contacts that are arranged next to each other, parallel, and in a single row") other than for "the entire length"/"where the contacts mate" part of the dispute.

[12] At the September 30th argument, I learned that "lead lines" are the solid—not dotted—lines connecting the numbers used to describe parts of figures in the patent with the drawing of that part.

contact springs, not all of which are within the portions where the jack mates with the plug; the specification also differentiates between, on the one hand, "contacts," and, on the other hand, "contact points" on the contacts. (*Id.* at 41). Fourth, CommScope argues that the applicant "having taken the position during prosecution that Merchant has 'two rows of contacts[,]'" the doctrine of equivalents precludes Belden from "captur[ing] the structure as a single row . . . ." (*Id.* at 45–46). Fifth, CommScope argues that "ordinary parlance in the industry, including Belden Canada's own documents, distinguish[es] between jack 'contacts' and contact points/regions/zones." (*Id.* at 42) (collecting citations).

In response, Belden argues that CommScope's construction would "tack on the extra limitation of 'along the entire length'" (D.I. 238 at 22), read out Figures 4B and 4D from Reede, ignore the "functioning of the claimed invention," and ignore Claim 6's use of the broad term "comprising." (*Id.* at 23).

I conclude that CommScope has the better of the argument. "If the claim language is clear on its face, then [] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Fifth Generation Computer Corp. v. Int'l Bus. Machines Corp.*, 416 F. App'x 74, 80 (Fed. Cir. 2011) (quoting *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)). Here, the language of Claim 6 is clear: the "plurality of contacts" includes "cantilever spring contacts" that "hav[e] a mounted end and a moveable end . . . ." Reede, Claim 6. The plurality of contacts must be "juxtaposed side-by-side and arranged in a single row . . . ." Reede, Claim 6. The obvious conclusion from the Claim language is that the contacts must be juxtaposed side-by-side and arranged in a single row from the mounted end to the moveable end. Other claims further support CommScope's construction; as indicated in Claim 3, for example, Reede uses the term "contact point" to refer to

21

the area of the contact where the jack mates with the plug and forms a conductive path. Reede, Claim 3. If Reede intended that only the contact points be juxtaposed side-by-side and arranged in a single row, it could have easily said so.

Belden's strongest argument against CommScope's construction is that it would exclude two preferred embodiments of Reede, Figures 4B and 4D. (D.I. 238 at 22). According to Belden, and included below in Belden's annotations of the figures from the Reede patent, those figures show variations in elevation and/or crossovers among the contacts.



FIG. 4B



(D.I. 238 at 22) (Belden's annotations of Reede, Figure 4B, and Reede, Figure 4D). I take Belden's argument seriously: "a construction that excludes a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). I am not necessarily persuaded by Belden's interpretation, however. With respect to Figure 4B, Reede identifies section 90A (where Belden says there is a crossover) as a compensation structure. Reede, col. 10, lines 49–52. Similarly, with respect to Figure 4D, Reede identifies the crossover section, labeled 95A, as a "crossover structure" used to locate a capacitive plate between two other plates in a compensation structure. Reede, col. 11, lines 19–21. The "crossover" that Belden identifies may therefore be correctly considered as part of the compensation structure rather than the contacts themselves. (D.I. 260 at 13).

Based on the above, I adopt CommScope's construction of "plurality of contacts juxtaposed side-by-side and arranged in a single row": "Two or more closely positioned contacts

that are arranged next to each other, parallel, and in single row along the entire length of the contacts[.]"

### 2. "cantilever spring contacts"

The parties dispute the term "cantilever spring contacts" in Claim 6.    The parties characterized the present dispute as whether "cantilever" means "supported at one end" or "mounted on one end." (D.I. 229 at 46; D.I. 238 at 27).  In the original claim construction briefing, Belden's construction appears to be "the contacts of the jack are mounted on one end and form springs." (D.I. 81 at 38).  CommScope's construction appears to be "[a spring contact] being supported at only one end." (*Id.*).  I believe the parties' proposals were essentially the same at the September 30th argument.

The significance of this dispute is that "the contacts in [CommScope's non-MGS products] are supported at both ends, not only one end." (D.I. 229 at 46).  As described by CommScope, "the contacts include first ends that rest on (and [are] thus supported by) a horizontal PCB (green) and opposite second ends inserted into a vertical PCB (green)." (*Id.*).  CommScope provides the following drawing to illustrate its point:



(*Id.*) (citing DA1017–18).

Neither party devotes much ink to the issue of claim construction.  CommScope simply quotes a district court case in which the court noted, "[T]he defining characteristic [of 'cantilever']

is that the object is supported only at one end" and "a cantilever must necessarily have a free end" (D.I. 229 at 46) (quoting *RFR Indus., Inc. v. Century Steps, Inc.*, 1999 WL 765647, at *2 (N.D. Tex. Sept. 23, 1999)), as well as a dictionary definition providing that a cantilever is "[a] projecting structure, such as a beam, that is supported at only on end." (*Id.*) (citing D.I. 82 at JA0153).

Belden responds with two claim construction arguments. The first is that CommScope's construction is contrary to common sense, because it suggests that a cantilever spring ceases to be a cantilever spring as soon as any load is applied, as the load can be said to "support" the initially non-supported side. (D.I. 238 at 26). CommScope offers no meaningful response to this argument. (D.I. 260 at 15). Belden's second claim construction argument is that CommScope's proposed construction would read out the "Figure 3C preferred embodiment" of Reede.[13] (D.I. 238 at 26). In Figure 3C, "the cantilever spring contacts are designed to rest on the dielectric insert" (*id.*) (citing D.I. 81 at 43):

---

[13] I do not see anywhere in the patent where Figure 3 or the related figures 3A through 3D are referred to as "preferred" embodiments. Figure 3 is referred to as an "embodiment." Reede, 8: 22. By contrast, Figure 2 is referred to as "the preferred embodiment." Reede, 7:16. The patent also refers to a "preferred embodiment" without specifically referring to any of the figures. Reede, 4:60.



CommScope responds by noting that it is the compensation structure, not the spring contact, that rests on the dielectric insert in Belden's example. (D.I. 260 at 15–16).

I adopt Belden's construction. When "the patentee offers an ascertainable definition in the body of the claim, [courts should not] prescribe[e] a more particularized meaning unless a narrower construction is required by the specification or prosecution history." *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1372 (Fed. Cir. 2023) (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013)). Here, the language of the Claim reads, "said cantilever spring contacts having a mounted end and a moveable end." Reede, Claim 6. The Claim therefore supplies its own definition of "cantilever": "having a mounted end and a moveable end."[14] CommScope's construction, which would require that the spring be supported, not just mounted, on just one end, imparts an additional limitation not supported by the language in the Claim. CommScope points to nothing in "the specification or prosecution history" supporting that addition. *Malvern*, 85 F.4th at 1372. I therefore decline to adopt its construction.

---

[14] I don't think the Claim's description is very different from the dictionary definition.

### 3. "at least two of said spring contacts having capacitive coupling elements electrically connected to said moveable ends of said at least two spring contacts"

The parties dispute whether the term "having" in the third element of Claim 6 requires that the cantilever spring contacts *include* capacitive coupling elements or are simply connected to them. (D.I. 229 at 47–51; D.I. 238 at 27–30). CommScope proposes the construction: "[A]t least two of the cantilever spring contacts include capacitive coupling elements that have an electrically conductive connection to their respective moveable ends." (D.I. 229 at 47). In support of its construction, CommScope argues that the word "having" should be interpreted to be used consistently throughout the patent. (*Id.* at 48). Belden proposes the construction: "The moveable ends of at least two of the spring contacts are connected to capacitive coupling elements." (D.I. 238 at 30). In response to CommScope's argument about consistent meaning, Belden argues that the word "having" in this instance is used to convey "the relationship of contacts to the capacitive coupling elements," and thus, the other potential uses of the word "having" are not relevant to the definition in this particular use. (D.I. 238 at 29). The significance of this dispute is that "[i]n CommScope's design, the contacts do not have capacitive coupling elements as part of the contacts." (D.I. 229 at 48).

I adopt Belden's construction. In order for CommScope's construction to be correct, the capacitive coupling elements must be part of the cantilever spring contacts, but Reede's language, as well as CommScope's other summary judgment arguments, suggest that the capacitive coupling elements and the cantilever spring contacts are not the same thing, and the latter does not include the former.

### 4. "capacitive coupling elements *electrically connected* to said moveable ends of said at least two spring contacts"

27

CommScope argues that the accused MGS400 and MGS600 products do not have "capacitive coupling elements *electrically connected to said moveable ends* of said at least two spring contacts." (D.I. 229 at 52). This is so, CommScope argues, because there is "a deliberate gap between the front ends of the contacts and the PCB having the capacitive coupling elements." (*Id.*). The only time there exists an electrical connection between the front ends of the contacts and the PCB, CommScope argues, is "*after* a plug is inserted into the jack" (*id.* at 53), but because Claim 6 is directed "only to a jack" (*id.* at 53–54), CommScope says that the jack must be considered on its own, not in combination with the plug.

In response, Belden argues that an accused device may infringe "if it is determined, as a matter of fact, that it is readily configurable to infringe." (D.I. 238 at 31). Belden then asserts that the "claim language encompasses the in-use state of a device," and thus, Belden argues, that summary judgment is inappropriate because it is a factual dispute on "how the accused MGS400 and MGS600 jacks work during ordinary use." (*Id.*).

CommScope replies by pointing out the cases Belden relied on looked for infringement while the products were in use because the claims in those cases dealt with a "capability and/or function." (D.I. 260 at 18) (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204–05 (Fed. Cir. 2010); *Fantasy Sports Props, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118–19 (Fed. Cir. 2002); *Hilgraeve Corp. v. Symantec Corp.*, 256 F.3d 1336, 1342–44 (Fed. Cir. 2001)). Thus, the question underlying this dispute is whether Claim 6 involves a functional or structural limitation.

I adopt CommScope's construction. As used in Claim 6, "electrically connected" is a structural limitation. There is no language in the patent that indicates the electrical connection is a function or capability of the invention, rather, it describes a structure of it.

**F.  Other Outstanding Disputes.**

The parties have one claim construction issue dispute remaining.  Belden seeks a judicial correction of the phrase "a cantilever spring contacts" to address the mismatch of the singular "a" with the plural "contacts." (D.I. 81 at 61–62).  This typographical error, Belden claims, is evident from the face of the patent as later in Claim 6, the patent refers to "said cantilever spring contacts" in the plural.  (*Id.*).

In response, CommScope argues that the inclusion of the word "a" is not a typographical error.  (*Id.* at 63).  First, CommScope cites to the Certificate of Correction which removed the word "a" from the phrase "a cantilever spring contacts" in Claim 12 but did not change the other three instances the patent used the phrase.  (*Id.*) (citing Reede, Certificate of Correction).  Second, CommScope argues that "there is another possible correction: Keep the "a" and make each immediately successive 'cantilever sprig contacts' singular (i.e., delete the final 's')." (*Id.*).  CommScope argues this approach is also consistent with the way the patent refers to "a mounted end" and "a movable end" of the cantilever spring contacts.  (*Id.*).

I adopt Belden's construction.  The typographical error and the proper correction are clear from the face of the patent.  The subsequent reference in Claim 6 to "at least two of said contacts" clearly demonstrate that the patent intends to refer to multiple cantilever spring contacts.  While Belden had corrected the mistake one of four times in appears, there is no reason to believe this is anything more than another error in failing to identify and correct the other three uses of the phrase.  Thus, I adopt Belden's construction and judicially correct the relevant portion of Claim 6 to read "including cantilever spring contacts."

## IV.    CONCLUSION

For the reasons set forth herein, Belden's partial summary judgment motion (D.I. 222) is DENIED and its Daubert motion (D.I. 225) is GRANTED.  CommScope's equitable estoppel and non-infringement summary judgment motions (D.I. 223, 226) are DENIED, its failure to mark summary judgment motion (D.I. 224) is GRANTED, and its Daubert motion (D.I. 228) is DENIED. An appropriate order will issue.